<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-2(c)

Lawrence C. Gottlieb (LG-2565)
Adam C. Rogoff (AR-0820)
Eric J. Haber (EH-1999)
COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 479-6000
Telecopy: (212) 479-6275

**-and-**

Stephen V. Falanga (SF-6414)
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 535-0500
Telecopy: (973) 535-9217

Proposed Counsel for Debtor

</td><td></td></tr>
<tr><td>

In Re:

BAYONNE MEDICAL CENTER,

                  Debtor.

</td><td>

Chapter 11

Case No. _____

Judge: Hon. _____

Hearing Date: April __, 2007 at ___:___ _.m

</td></tr>
</table>

## DECLARATION OF DANIEL A. KANE IN SUPPORT OF
## FIRST DAY MOTIONS AND APPLICATIONS

I, Daniel A. Kane, declare as follows:

       1.       I am the acting President and Chief Executive Officer of Bayonne Medical Center

(the "<u>Debtor</u>" or the "<u>Medical Center</u>"), and I am familiar with the business and affairs of the

Debtor.

       2.       I submit this declaration (this "<u>Declaration</u>") in support of the Debtor's petition

for relief under chapter of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), filed on

the date hereof, and the relief, in the form of motions and applications, that the Debtor has requested of the Court (the "First Day Motions and Applications").  I believe that the relief sought in each of the First Day Motions and Applications (a) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption to its operations or loss of value, (b) constitutes a critical element in achieving a successful reorganization of the Debtor, and (c) best serves the interests of the Debtor's estate and its creditors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other members of the Debtor's management or professionals, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis.  I am authorized to submit this Declaration.

4.      This Declaration is intended to provide a summary overview of the Debtor and the events leading to the commencement of the chapter 11 case.  Part I provides an overview of the Debtor's business and the circumstances that compelled the filing of the chapter 11 case.  Part II sets forth the relevant facts in support of the First Day Motions and Applications.

## THE DEBTOR'S BUSINESS

5.      Established in 1888, the Debtor is a non-stock, non-profit corporation under the laws of the State of New Jersey, which operates a 278-bed fully accredited, acute-care hospital located in Hudson County.  Since opening its doors more than a century ago, it has been committed to providing quality, comprehensive, community-based healthcare services to more than 80,000 people annually.

6.      In February 2007, I joined the Medical Center as acting President and Chief Executive Officer.  Shortly thereafter, I retained the services of an acting Chief Financial Officer and an acting Chief Information Officer.  We joined the Medical Center as part of the action by the Debtor's Board to terminate prior senior management for cause.  Accordingly, new senior management is in place to implement fresh strategies to enable the Medical Center to bring its revenues in balance with expenses.  Further, the Medical Center has retained the services of FTI Cambio, one of the largest health care restructuring firms in the United States, to assist us in our restructuring operations.

7.      The Debtor offers a wide spectrum of healthcare specialties, servicing every segment of the community from pediatric to elderly.  Among the services offered are general internal medicine, medical and radiation oncology; cardiology (including elective and emergency angioplasty); neurology; gastroenterology; ophthalmology; endocrinology; gynecology; hematology; mammography; bone density; emergency room; physical therapy; and family practice.  Additionally, the Medical Center offers comprehensive inpatient and same day surgical services, and  operates a Vascular Institute and Women's Center.  Additionally, a Wound and Hyperbaric Medicine Service is scheduled to open in May 2007.

8.      The Debtor is accredited by the Joint Commission on Accreditation of Healthcare Organizations, the American College of Surgeons for Cancer Care, the American Diabetes Association, the College of American Pathologists, the American Association of Blood Banks, the American College of Radiology, and the Intersocietal Commission for the Accreditation of Nuclear Medicine Laboratories (ICANL).   Memberships include the American Hospital Association, the New Jersey Hospital Association, and the Hudson Perinatal Consortium.

9.      The Bayonne Medical Center School of Nursing (the "Nursing School") has been

3

educating nurses since 1891.  The Nursing School is a accredited by the New Jersey Board of
Nursing and National League for Nursing Accreditation Commission.  It is a partnership with
Hudson County Community College which trains nurses to serve both at the Medical Center and
the community at large.

10.    In addition, the Medical Center has an informal alliance relationship with
Richmond University Medical Center ("RUMC"), a 440-bed facility in Staten Island, New York
serving over 450,000 residents.  Under this relationship, the Medical Center and RUMC share
certain services and costs as agreed between the two hospitals.  It is my hope that, as part of this
chapter 11 case, we will be able to formalize an alliance arrangement with RUMC that will allow
each medical institution to agree upon specific shared services and costs, resulting in a savings
for each hospital.  Among other aspects of such an alliance, the Debtor and RUMC would be
able to jointly bid for goods and services to be furnished by third-party providers, thus reducing
costs.

11.    The Medical Center has one wholly-owned subsidiary, the Bayonne Medical
Center Foundation (the "Foundation").  The Foundation was founded in 1982 and is funded
through voluntary contributions by individuals, businesses and other foundations and its purpose
is to assist in the financial support of the Medical Center.

12.    The Debtor is an integral part of the greater Bayonne community. Because
Bayonne is  a peninsula surrounded by water, it is difficult for its residents to obtain medical care
elsewhere than the Medical Center due to  travel time, which is exacerbated if public
transportation must be used.  As has been well recognized, the City of Bayonne has enjoyed an
urban revitalization in recent years by virtue of several major projects, including the anticipated
conversion of a 430 acre former military base into a mixed use community. Combined with other

4

expected residential development in other areas of Bayonne, the town is expected to realize a population increase of approximately 5000 residents within the next five years. This expansion will hopefully provide future growth opportunities for the Debtor's medical services.

13.     In addition, another consideration in assessing the need for an acute care hospital in Bayonne is the town's large elderly population. Compared to other areas of Hudson County, Bayonne has the highest percentage of residents in age categories of 45-64 as well as 65 and over. It is self-evident that both these two age groups have the greatest need for hospital and medical services. Accordingly, in December 2006, the Debtor entered into an agreement to sell certain property adjacent to the Medical Center to Bayonne/OMNI LLC, a nursing home provider which will develop a 120-bed long term care facility.  This new facility will allow greater continuity of care and less travel disruption for family and patients when acute care services are needed.  Groundbreaking is expected to occur in Fall 2007.

14.     In 2006, the Medical Center recorded 44,955 outpatient visits, 30,406 emergency room visits and 8,353 admissions.  The Debtor has 1065 employees, 945 of which are affiliated with the Hospital Professional and Allied Employees (HPAE) and Operating Engineers Local 68 (AFL-CIO) unions.  More than 255 physicians are affiliated with the Medical Center.

15.     The Debtor is a substantial provider of charitable care.  Because many residents in Bayonne have a modest income and lack insurance, the Medical Center is used by these residents as a primary health care provider.  During 2006, the Debtor provided $8,746,000 in charity care.[1]

16.     In 2006, the Debtor had total unrestricted revenue of $102,237,000 and suffered a

---

[1] In connection therewith, the New Jersey Healthcare Subsidy Fund was established for various purposes, including the distribution of charity payments to hospitals statewide.  In 2006, the Medical Center received $3,980,000 in subsidy payments for charitable care.

net operating loss of $39,573,000 on an unaudited basis.[2]

17.    As discussed more specifically below, prior to the commencement of this chapter 11 case, the Debtor suffered a liquidity crisis affecting its ability to meet its obligations in a timely manner.  The Debtor, with the assistance of its advisors, began an analysis of its operating costs and revenues in an effort to determine a cost-effective way to streamline future operations to support an effective turn-around.  This process is on-going.  At the same time, the Debtor has also begun the process of evaluating its options for a merger or sale of the Medical Center as a going concern.  The Debtor's primary focus has been and remains determining the optimal manner in which to preserve the Medical Center's business operations and continuing to serve the greater Bayonne community and the needs of the Debtor's patients and other constituents. The commencement of this Chapter 11 case is a necessary component of facilitating either a standalone restructuring or future going concern transaction.

## EVENTS LEADING TO CHAPTER 11

A.    **The Distressed Health Care Environment in New Jersey**

18.    In recent years, acute care hospitals in New Jersey have faced significant financial challenges and these pressures have had a generally negative impact on the Debtor.  First, the method in which health care services are provided has changed significantly.  Hospitals (including the Medical Center) have been adversely impacted by competition from private doctors and other outpatient facilities and clinics providing care outside of a hospital setting that previously could only be obtained in a hospital. Accordingly, there is intense competition for certain profitable services now being offered in greater numbers on an outpatient basis.

19.    At the same time, reimbursements from Medicare and Medicaid have remained

---

[2]    This is an approximated number which is subject to further analysis and changes.

flat or declined, and managed-care plans have utilized their bargaining power to keep reimbursement rates low, which has adversely affected hospital revenues. While these revenues are being reduced, overall operating costs are rising faster than inflation. The costs of medical equipment, technology and supplies continue to increase, as does the cost of professional liability insurance.

20.    According to a study prepared by Accenture at the request of the New Jersey Hospital Association dated October 3, 2006 (the "Accenture Report"), the fiscal health of New Jersey's hospitals significantly lags behind national averages and the number of New Jersey hospital incurring operating losses in 2005 stood at 41.7% - more than double the national average of 18%. While national median operating margins increased from 2000 to 2005, those in New Jersey actually declined. In 2005, the median operating margin in New Jersey was 0.5% as compared to 2.8% in the United States. Accenture Report at p.10.

21.    Second, Accenture found that there is a significant difference between the performance of hospitals in northern New Jersey and southern New Jersey. In 2004, the average operating margin of hospitals in southern New Jersey was 3.5% as opposed to an average operating margin of just 0.2% for northern New Jersey hospitals such as the Medical Center. Accenture Report at p. 12.

22.    Moreover, the Accenture Report divided New Jersey into seven regions and found that hospitals in the Hudson County region had the worst operating margins which were -6.11% as of the period ending March 31, 2006. Moreover, hospitals in Hudson County had an average of just 3.64 days operating cash available as compared to a state-wide average of 69.93 days operating cash available as of that date. Accenture Report at p.76. According to Accenture, the reason for the weaker performance in Hudson County (as well as Essex and Union County) is

that all three counties are densely populated and contain a greater number of hospitals.  In addition, the payer mix is slanted toward governmental payers and large indigent populations.

23.     In connection therewith, the United States 2000 census determined that per capita income in Bayonne was $21,353, median household income was $41,566 and median family income was $52,413.

24.     Another major problem facing New Jersey hospitals is that since the advent of the Balanced Budget Act of 1997, Medicare reimbursement has not kept up with the cost of providing care.  This has become increasingly more significant over the last few years.  In fact, in 2004, the American Hospital Association calculated that the average Medicare inpatient payment to cost ratio was approximately 92% in the United States.  However, in 2004, New Jersey's average Medicare inpatient payment to cost ratio fell to 88%, resulting in a 13.6% operating loss for New Jersey hospitals for Medicare inpatients.  Accenture Report at p. 26. Similarly, in 2004 New Jersey Medicaid payment to cost ratio was 73%, resulting in a 36.9% operating loss for New Jersey hospitals treating Medicaid patients.  Ironically, for most New Jersey hospitals, Medicare is the best payor, whereas elsewhere in the United States Medicare payment rates fall far below commercial insurance payors.

25.     Further exacerbating the situation, the cost of professional liability insurance in New Jersey has skyrocketed.  New Jersey hospitals have seen their malpractice costs increase 180% from 2000 to 2004, increasing from $53.3 million to $149.1 million according to the New Jersey Hospital Association.  Accenture Report at p. 77.

B.     **The Medical Center's Liquidity Crisis**

26.     The problems discussed above facing hospitals in New Jersey generally have also taken their toll on the Medical Center.  The Debtor's bankruptcy filing was precipitated by a

8

liquidity crisis because it was unable to generate sufficient cash flow to meet operating needs. Prior to the filing, the Debtor attempted to reduce its expenses, with particular attention to labor costs by reducing its workforce by 100 employees in 2006.  As an additional effort to curtail expenses, the Medical Center was constrained to move its Senior Health Center and its Community Crossings Program which provided free screening and education programs from a community location to the hospital facility.

27.     Revenue from the Medicare and Medicaid programs accounted for approximately 60% and 2% respectively of the Medical Center's net patient revenue in 2005.  However, as noted in the prior section, the cost of providing services to Medicare and Medicaid patients, particularly those with longer stays, now exceeds the reimbursement received by the Medical Center.  In addition, because the criteria for Medicare admissions are more stringent, more patients are now treated on an outpatient basis. Also, depending on a patient's condition and certain criteria being met, a number of patients previously admitted as inpatients are now admitted under an "observational status" category (approximately 500 cases in 2006), which yields a much lower level of reimbursement relative to a regular admission.

28.     Further, consistent with present trends, the Medical Center has lost significant volume as physicians have been directing patients to free-standing facilities outside of the hospital in increasing numbers.  During this reorganization proceeding, a challenge will be for Medical Center's new management team to restore volume by devising growth strategies.  One such strategy is to implement additional special procedures which are profitable.  Fortunately, due to the significant number of development projects underway in the City of Bayonne at this time, there is a projected increase in population in the next 5 to 10 years.  In addition, patients will be drawn from the new nursing care facility.  During the chapter 11 case, the Debtor will be

continuing its efforts to reduce costs while developing a turnaround plan to increase revenues and, ultimately, stanch operating losses.  However, the Debtor made the difficult decision to seek relief on chapter 11 in order to obtain access to critical additional debtor-in-possession financing when it became apparent that it would not be able to generate or obtain sufficient liquidity to continue its operations without doing so.

## CAPITAL STRUCTURE AND PRE-PETITION INDEBTEDNESS[3]

29.    Excluding ordinary course trade debt, the Debtor's pre-petition indebtedness consists primarily of (i) revenue bonds issued by the New Jersey Health Care Facilities Financial Authority, which ultimately are collateralized by a pledge on gross receipts ("Gross Receipts") of the Medical Center, (ii) two working capital borrowing facilities, one of which is secured by a mortgage on certain real estate and (iii) capital lease obligations.  As of the Petition Date, the Debtor's aggregate indebtedness for such obligations was approximately $56,170,000, including $45,340,000 of debt in connection with the revenue bonds, $6,900,000 owed on the working capital borrowing facilities and $3,930,000 owed on the capital lease obligations.  Significantly, the Debtor's primary owned real estate – the hospital facility – which has an appraised value of approximately $43 million is unencumbered, thus affording the Debtor the opportunity to use that real estate as collateral in order to obtain necessary debtor-in-possession financing.

### A.    Revenue Bond Financing

30.    The New Jersey Health Care Facilities Financial Authority (the "Authority") issued two series of revenue bonds (the "Revenue Bonds") to provide funds for the Medical

---

[3]    The description of the Debtor's indebtedness in this section is for informational purposes only.  Nothing herein constitutes a waiver of the Debtor's rights to challenge the validity of any of such indebtedness and/or asserted rights relating thereto, including any asserted security interests.

Center.   The Revenue Bonds are ultimately collateralized by a pledge on Gross Receipts of the Medical Center under a Master Trust Indenture between Bayonne Hospital (the predecessor to the Debtor) and United Jersey Bank as Master Trustee (as ultimately succeeded by Bank of New York) dated as of December 1, 1994 (as amended, the "Master Trust Indenture").   The Master Trust Indenture has been amended by four (4) separate Supplemental Indentures.  Payment of the Revenue Bonds is insured by Financial Security Assurance Inc.

31.     In 1994, the Authority issued $35,145,000 in Revenue Bonds (the "1994 Revenue Bonds") in varying maturities through July 1, 2012.   The current balance due on the 1994 Revenue Bonds is $11,485,000 in principal amount.

32.     In 1998, the Authority issued $22,725,000 in principal amount in Revenue Bonds (the "1998 Revenue Bonds") in varying maturities from July 1, 2013 through July 1, 2027.  The entire principal amount of the 1998 Revenue Bonds remains outstanding.

33.     On November 3, 2005, Lehman Brothers, Inc ("Lehman") provided $1,400,000 in financing to the Debtor in exchange for a  promissory note (the "Lehman Note") issued pursuant to, and secured under, the Master Trust Indenture.  Lehman is entitled to the ratable benefit of the security interest in the Gross Receipts under the Master Trust Indenture. The entire principal amount of the Lehman Note remains outstanding.

34.     On October 11, 2006, Nuveen High Yield Bond Fund ("Nuveen") entered into a certain Loan and Security Agreement with the Debtor pursuant to which Nuveen provided the Debtor with $10,000,000 in bridge financing (the "Bridge Loan") evidenced by a Bond Anticipation Note (the "Nuveen Note").  The Nuveen Note was issued pursuant to, and secured by the Master Trust Indenture.  Nuveen is entitled to the ratable benefit of the security interest in the Gross Receipts under the Master Trust Indenture.  The balance due under the Bridge Loan is

$9,500,000.

### B.    **Additional Pre-Petition Debt**

35.     On December 6, 2006. Pamrapo Savings Bank provided the Debtor with a $1.9 million line of credit in exchange for a mortgage on certain land and a promissory note (the "Pamrapo Note"). The entire principal amount remains due on the Pamrapo Note.

36.     In addition, the Debtor has various capital lease obligations and other secured notes for equipment and improvements collateralized by the related assets.  As of the Petition Date, the total indebtedness for such obligations was $3,930,000.

### C.    **Unsecured Revolving Loan Agreement**

37.     The Debtor has a $5 million line of credit under a revolving loan agreement with TD Bank North N.A. ("TD Bank North") which is unsecured.  As of the Petition Date, the balance due to TD Bank North under that line of credit was $5 million.

### SUMMARY OF FIRST DAY MOTIONS

38.     Concurrently with the filing of its Chapter 11 petition, the Debtor has filed certain applications, motions, and proposed orders (collectively, the "First Day Motions") in order to minimize the adverse effects of the commencement of the Debtor's bankruptcy case on its business and the reorganization process.  I believe that the successfulness of this case hinges on the Debtor obtaining approval of the Debtor's First Day Motions.  The factual background and support of each First Day Motion is set forth below and/or set forth in the respective First Day Motion, which I have reviewed and certify that the facts contained therein are true and correct to the best of my information, knowledge and belief.

### A.    Application For Designation As A Complex Chapter 11 Case

39.    The Debtor has total liabilities of more than $94 million, total assets of more than $88 million, and more than 1,500 creditors.  Being designated as a complex Chapter 11 case will enable the Debtor to effectively and efficiently administer the case in compliance with the Court's rules and guidelines.

### B.    Debtor's Motion for Interim and Final Order for Authorization (1) to Enter Into Post-Petition Credit Agreement and Obtain Post-Petition Financing and Granting Liens, Security Interests and Superpriority Claims, (2) Granting Adequate Protection and Authorizing Use of Cash Collateral and (3) Scheduling a Final Hearing

40.    The Debtor's liquidity crisis has left it with virtually no available cash to fund its ongoing operations.  Accordingly, the Debtor urgently needs the use of cash collateral and to obtain new credit to purchase supplies, pay its employees, and continue its business and operations.  Without the immediate availability of the cash collateral and new credit, the Debtor's operations would be severely disrupted and it would be forced to cease or sharply curtail operations, which in turn would limit or eliminate the Debtor's ability to generate operating revenue.  In simple terms, the Debtor would be irreparably harmed if this Court denies the interim relief sought in the motion for an order (i) authorizing post-petition secured superpriority financing; (ii) granting adequate protection and authorizing the use of cash collateral and (iii) scheduling a final hearing (the "DIP/Cash Collateral Motion") is not granted.

41.    Given the Debtor's liquidity crisis, it cannot operate solely in reliance on its cash-on-hand without debtor-in-possession financing. First, the Debtor must be able to use cash collateral in the form of pre-petition accounts receivable.  In addition, the use of cash collateral generated from existing liens to the extent of the Debtor's ability to grant replacement liens in

post-petition receivables is not sufficient to sustain operations. Nor was the Debtor able to procure financing without granting liens on its assets. Accordingly, the Debtor, together with its attorneys and financial advisors, sought proposals for post-petition financing from Kimco Capital Corporation ("Kimco"), as well as other financial institutions.

42.    Because it has been unable to procure the necessary financing from any other source, the Debtor has determined to accept a financing proposal put forward by Kimco as Lender and Agent. The Debtor believes that the Kimco financing proposal (together with the use of existing cash collateral as of the Petition Date) addresses the Debtor's immediate working capital and liquidity needs.

43.    The Debtor and Kimco engaged in good faith and extensive arm's length negotiations. The terms and conditions of the proposed post-petition financing facility are set forth in that certain Debtor-In-Possession Credit Agreement (the "Post-Petition Credit Agreement") among the Debtor, as Borrower, and Kimco, as Lender and Administrative Agent, as well as the proposed interim and final orders granting the DIP/Cash Collateral Motion.

44.    The availability of post-petition financing will provide more than just the necessary cash for the Debtor to operate its business. Equally important is the sense of confidence that the financing will instill in the Debtor's suppliers, vendors, patients, and employees and the overall community which the Debtor serves. If the Debtor's suppliers failed to extend credit and services to the Debtor at this time, the loss of patients, and the impact on employee morale could have a profound negative impact on the Debtor's ability to reorganize and preserve value.

45.    In sum, without immediate access both to (i) existing cash collateral as of the Petition Date and (ii) additional post-petition financing, the Debtor faces a liquidity crisis that

14

threatens the viability of its business.  If cash is not available to maintain business-as-usual operations during the critical period immediately following commencement of this case, the Debtor will likely face a substantial if not devastating loss of revenue and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of employees and employee morale, and deteriorating relationships with suppliers and patients – all of which would adversely affect the value of the Medical Center.  Importantly, the Debtor would simply not be able to provide sufficiently for the health, care and safety of its patients.  Accordingly, the ability of the Debtor to remain a viable operating entity, reorganize under Chapter 11 of the Bankruptcy Code, and preserve value pending a reorganization of their businesses depends upon obtaining the interim and final relief requested in the DIP/Cash Collateral Motion.

46.     Under the terms of the post-petition financing, the Debtor will obtain a post-petition line of credit in the aggregate principal amount of up to $30 million.  An essential feature of the post-petition financing is that the Debtor is utilizing previously unencumbered real estate with an estimated appraisal value of approximately $43 million as part of the collateral offered to Kimco as security for the post-petition financing.

47.     The proposed post-petition financing will operate in two stages. First, the Debtor requests initial loans and advances totaling $10 million under the proposed interim order, which amount is expected to be sufficient to satisfy the Debtor's working capital needs and operating requirements during the interim period pending a final hearing, subject to the DIP Loan Documents.

48.     Upon approval at the final hearing to consider the DIP/Cash Collateral Motion, the entire $30 million under the post-petition financing facility will become available for the Debtor's use, subject to the terms of the Post-Petition Credit Agreement.

49.    In addition, the DIP/Cash Collateral Motion seeks authorization for the Debtor to use cash collateral consisting of its accounts receivable and/or gross receipts pursuant to Sections 361 and 363(c)(2) of the Bankruptcy Code to fund operations.  The holders of pre-petition liens on accounts receivable and/or gross receipts shall be provided adequate protection in the form of a first priority valid, perfected and enforceable replacement lien in the proceeds of the Debtor's post-petition accounts receivable to the extent of any use of such cash collateral.

**C.    Debtor's Motion To (I) Authorize, But Not Direct, The Debtor To (A) Pay Unpaid Pre-petition Wages And Related Obligations, (B) Reimburse Pre-petition Employee Business Expenses, And (C) Honor Other Pre-petition Employee Benefits; (II) Authorize, But Not Direct, The Debtor To Pay Obligations Related To Medical Providers; And (III) Direct Banks To Honor Checks With Respect Thereto**

50.    The Debtor requests that it be authorized, in its sole discretion, to pay the aggregate amount of accrued wages and salaries that have not yet been paid to the Employees (defined below) for periods prior to the Petition Date, and that the Debtor's banks be authorized and directed to honor or send all checks or wire transfers, as the case may be, for all pre-petition wages that have either already been sent on behalf of the Employees but not yet presented for payment or have yet to clear through the banking system.

**PRE-PETITION WAGES**

51.    As of the Petition Date, the Debtor employed approximately 1,090 employees, composed of approximately 120 non-union Employees and 970 union Employees.  Employees are paid bi-weekly, in two separate groups in alternating weeks (referred to herein as the "Group A Employees" and the "Group B Employees" and, together, the "Employees") with each payroll being made five days in arrears.  Group A Employees consist of the Debtor's nursing employees.

16

The average bi-weekly payroll for Group A Employees is approximately $995,000.  Group B Employees consist of all other (non-nursing) Employees.  The average bi-weekly payroll for Group B Employees is approximately $950,000.  Thus, the aggregate amount of wages paid to Employees is approximately $1.9 million every two weeks.  The last payroll for Group A Employees covered salaries and wages accrued through April 14, 2007 and the last payroll for Group B Employees covered salaries and wages accrued through April 7, 2007.  Consequently, as of the Petition Date, the only unpaid wage and salary obligations owed by the Debtor to the Employees would be amounts owed on account of services provided by the Employees since April 7, 2007 (for Group B Employees) and April 14, 2007 (for Group A Employees), in the approximate aggregate amount of $730,000.

52.    It is also possible that checks that have been previously issued to the Employees on account of Employee Obligations may have not yet been presented for payment or may have not yet cleared through the banking system.  Thus, the Debtor requests that it be authorized, in its sole discretion, to pay the aggregate amount of accrued wages and salaries that have not yet been paid to the Employees for periods prior to the Petition Date, and that the Banks be authorized and directed to honor or send all checks or wire transfers, as the case may be, for all pre-petition wages that have either already been sent on behalf of the Employees but not yet presented for payment or have yet to clear through the banking system..

**WITHHOLDING TAXES**

53.    The Debtor is required by law to withhold from its Employees' wages all applicable federal, state, and local income taxes, state unemployment taxes, and social security and Medicare taxes, and in certain instances, to pay expenses related thereto (collectively, the

"Trust Fund Taxes").   The Debtor is also required to remit the Trust Fund Taxes to the appropriate taxing authorities.   In addition, the Debtor makes deductions from the Employees' paychecks for health care benefit programs, pension savings programs (ERISA section 401(a)), tax-deferred annuity plans (ERISA section 403(b)), insurance, garnishments, support payments, union dues, charitable contributions, flexible spending, tuition assistance and other similar programs (collectively, the "Deductions" and together with the Trust Fund Taxes, the "Withholdings"), and makes payments on behalf of the Employees to such third party benefit providers.   The Debtor transfers such Withholdings to the appropriate government agencies and/or benefit providers in accordance with the payment schedules established by such agencies and/or providers.

54.     For Group A Employees, approximately $415,000 in the aggregate is withheld and then transferred to the appropriate governmental agencies, third parties and/or benefit providers on a bi-weekly basis.    For Group B Employees, approximately $350,000 in the aggregate is withheld and then transferred to the appropriate governmental agencies, third parties and/or benefit providers on a bi-weekly basis.  As of the Petition Date, the Debtor has not yet transferred all Withholdings, and some transfers made may be currently outstanding or may have not yet cleared through the banking system.  Since the Withholdings are not property of the Debtor's estate, but rather of each individual Employee, the Debtor requests that it be authorized, but not directed, to (a) transfer any Withholdings relating to the period prior to the Petition Date to the appropriate agencies, third parties and/or benefit providers in the ordinary course of business, and (b) continue to withhold the Withholdings in the ordinary course of business and make the required transfers to the appropriate agencies, third parties and/or benefit providers on a going forward basis.

## REIMBURSABLE EXPENSES

55.     The Debtor customarily reimburses certain of its Employees for business expenses incurred in connection with services rendered for the benefit of the Debtor, including, without limitation, those relating to meals, travel, and other ordinary course reimbursable employee business expenses.   Expense reimbursement requests for pre-petition business expenses may be currently outstanding or may have been made but not yet processed.   The Debtor estimates that approximately $12,600 of such business expenses remain unpaid.   The Debtor respectfully requests that it be authorized but not directed, in its sole discretion, to pay such amounts in the ordinary course of business.

## BENEFITS

56.     As is customary for any major business such as the Debtor's medical center, the Debtor provides its Employees with certain general welfare benefits, including, without limitation, medical, prescription, dental, vision, ERISA section 401(a) savings and investment plan matches, life insurance and other insurance coverage (collectively, the "Benefits").

57.     With respect to the Debtor's medical insurance, Employees are permitted to participate in either the Debtor's self-insured plan administered by QualCare, Inc. or a private-carrier plan through Horizon Blue Cross Blue Shield of New Jersey ("Horizon").   The Debtor provides prescription coverage to its Employees through Garden State Pharmacy Owners Provider Services, Inc.   With respect to its dental benefits, the Debtor uses Horizon for all Employees.   The Debtor provides vision coverage only to those Employees participating in the Debtor's self-insured medical insurance program.   In addition, life insurance is provided to all Employees through New Jersey Health Association.   The Debtor also provides long-term

19

disability insurance to its management personnel through UNUM Provident. The total average monthly premium and payments made by the Debtor on behalf of its Employees for the foregoing benefits (excluding ERISA section 401(a) savings and investment plan matches) and into the applicable benefit plans is approximately $970,000. The Debtor estimates that, as of the Petition Date, approximately $710,000 in unpaid premiums and payments were owed on account of the foregoing benefits.

58.     In addition to the health care and insurance coverage benefits described above, the Debtor also maintains an ERISA section 401(a) savings and investment plan (the "Employee Pension Plan") pursuant to which the Debtor provides certain base level matches of Employee contributions up to five percent (5%). Effective January 1, 2006, the Debtor also makes automatic contributions of one percent (1%) of an Employee's annual base salary to the Employee Pension Plan each year, regardless of whether the Employee makes an individual contribution or not. This automatic contribution is not subject to the five percent (5%) match. The Debtor makes the foregoing contributions to the Employee Pension Plan on an annual basis based on and in accordance with ERISA regulations. In accordance with these timing requirements, the Debtor estimates that on or about November 17, 2007, approximately $1.9 million will be due the Pension Plan on account of base level match and automatic contributions accrued during 2006. (Additionally, the Debtor estimates that approximately $390,000 in base level match and automatic contributions have accrued prior to the Petition Date and, in accordance with the timing requirements for payment, will not be due by the Debtor until Fall 2008.)

59.     In short, the Debtor estimates that, as of the Petition Date, the total aggregate amount owed (or otherwise accrued) in respect of the Benefits is approximately $3 million. The

20

Debtor's employee benefit programs are an integral part of each Employee's total compensation package. Interruption of such additional benefits would seriously disrupt the morale of the Employees and would undermine the Debtor's efforts in this chapter 11 process. Thus, the Debtor requests authority to pay, in its sole discretion, certain pre-petition amounts attributable to the Benefits from time to time, as and when such amounts become due and in the ordinary course of the Debtor's reorganization.

## PAID TIME OFF AND OTHER LEAVE

60.    Under the Debtor's existing paid time off ("PTO") policy, Employees are generally eligible for 18 to 33 days of PTO per year based on their position and length of tenure with the Debtor. PTO is accrued by Employees over the course of each anniversary year and may be used for scheduled absences such as vacation or other personal use or unscheduled absences such as an Employee's illness or family emergency. The rate of pay that Employees receive for PTO is an amount equal to their base rate of pay plus any regularly scheduled shift differential[4], if applicable. A maximum of two year's accruals may be carried over to an Employee's next anniversary year. Employees have the option to cash in up to eight unused PTO days (64 hours) at 75% of their value at the end of each calendar year. The Debtor believes it is appropriate to allow Employees, in accordance with the Debtor's policies and practices established prior to the Petition Date, to (i) take PTO accrued as of the Petition Date and thereafter in the ordinary course of the Debtor's reorganization, and (ii) cash in PTO accrued as of the Petition Date and thereafter in the ordinary course of the Debtor's reorganization.

---

[4]    "Shift differential" refers to the type of the shift worked by an Employee. Those Employees who work "off hour" shifts are generally entitled to receive their base salary plus an additional amount equal to between 10% and 12% of their base salaries, depending on the specific "off hour" shift worked. The calculation of an Employee's rate of pay for PTO takes into account any "shift differential" salary augmentation.

61.     The Debtor's sick leave policy compensates those Employees who are unable to perform their duties because of illness or injury.  Following completion of a successful probation period, all full-time Employees accrue sick time at the rate of 80 hours per year divided by 26 pay-periods and all half-time Employees are eligible to receive a pro-rated amount of sick time at the rate of 40 hours per year divided by 26 pay periods.[5]  Employees who have accrued sick time are not entitled to receive the cash value of such accrued time, except that, at the end of each calendar year, those Employees who have not used sick time during the preceding calendar year are eligible to receive the cash value of up to four days.  Additionally, Employees who have not used sick time during the preceding calendar year are eligible to receive a "perfect attendance" check for $500.  The Debtor believes it is appropriate to allow Employees, in accordance with the Debtor's policies and practices established prior to the Petition Date, to (i) take sick time accrued as of the Petition Date and thereafter in the ordinary course of the Debtor's reorganization, and (ii) cash in sick time accrued as of the Petition Date and thereafter in the ordinary course of the Debtor's reorganization.

62.     The Debtor also maintains an extended illness bank ("EIB") policy comprised of Employees' sick time accrued prior to January 1, 2000.  Employees hired after September 1, 1999 are not eligible for an EIB.  Eligible Employees may use EIB for Family & Medical Leave Act qualified leave for a serious illness or injury of three or more consecutive days.  Eligible Employees who become permanently disabled may utilize all days in their EIB as terminal leave.  In the event of a serious illness of a family member, EIB may be used after the Employee's PTO accrual is exhausted.  Employees hired prior to January 1, 1996 and who have accumulated EIB

---

[5]     Pursuant to certain concessions recently agreed to between the Debtor and the Health Professionals And Allied Employees, AFT/AFL-CIO, commencing on April 1, 2007, all full-time Employees accrue sick time at the rate of 64 hours per year divided by 26 pay-periods and all half-time Employees are eligible to receive a pro-rated amount of sick time at the rate of 32 hours per year divided by 26 pay periods.

time may be eligible to participate in the Debtor's EIB reimbursement plan[6] upon termination of employment with proper notice in accordance with the Debtor's policies and practices established prior to the Petition Date.

63.    The Debtor estimates that the aggregate amount of accrued PTO and other leave benefits described above as of the Petition Date is approximately $5.3 million.  The Debtor seeks authority to continue its established policies and practices with respect to allowing Employees to use and/or receive the cash value of accrued PTO and other leave benefits only in the ordinary course of the Debtor's reorganization.    The Debtor expressly reserves all rights to seek modifications to the relief sought herein at a later time.

64.    The Employees are essential to the continued operation of the Debtor's business and successful reorganization thereof.  They are the "life blood" of the Debtor's businesses and provide services essential to the safety, care and health of the Debtor's patients.  The Employees' morale directly affects their effectiveness and productivity and potentially impacts the care of the Debtor's patients.  Consequently, it is critical that the Debtor have the discretion to continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date with respect to the Employee Obligations.    If the checks issued and electronic fund transfers requested in payment of any of the Employee Obligations have been or are dishonored, or if such obligations are not timely paid post-petition, the Debtor believes that many of the Employees will suffer extreme personal hardship and may be unable to pay their daily living expenses.  These circumstances undoubtedly will adversely affect their performance and similarly impact the Debtor's ability to provide necessary and quality medical care to patients and its reorganization efforts, to the detriment of all parties in interest.

---

[6]    The EIB reimbursement plan allows eligible employees to use EIB for illness or injury of three or more consecutive days.  EIB may be used retroactive for the first day of illness or injury.

65.      In addition, it would be inequitable to require the Debtor's Employees to bear personally the cost of any business expenses they incurred pre-petition, for the benefit of the Debtor, with the understanding that they would be reimbursed.  The Debtor submits that it is critical that it be permitted to continue its pre-petition policies of allowing its Employees to incur reasonable and necessary business-related expenses and seek reimbursement therefore by submitting appropriate requests for cash disbursements and receipts evidencing such out-of-pocket disbursements.

66.      Payment of the Employee Obligations in accordance with the Debtor's discretion and pre-petition business practices is in the best interest of the Debtor's estate, its creditors, and all parties in interest and will enable the Debtor to continue to operate its business in an economic and efficient manner without disruption.  The Employees are central to the Debtor's operations and are vital to its restructuring.  The total amount sought herein to be paid is relatively modest in comparison to the size of the Debtor's overall business and the importance of the Employees to the Debtor's reorganization efforts.

67.      The Debtor believes that the majority of its Employees are owed amounts equal to or less than $10,950 on account of Employee Obligations accrued prior to the Petition Date.  The Debtor believes that approximately 300 Employees are owed in excess of $10,950 on account of Employee Obligations accrued prior to the Petition Date.  The Debtor estimates that the aggregate amount owed to those Employees whose accrued Employee Obligations exceed $10,950 as of the Petition Date is $6.3 million.   Certain of the Debtor's Employees – such as members of the nursing staff – have been in the Debtor's employ for many years, reflective of their valuable contributions to the Medical Center.  The excess amount is predicated upon accruals of benefits over time, like PTO and EIB, for certain Employees and/or the contributions

24

to the Employee Pension Plan that, in the ordinary course, would not be made until November 2007. These are also amounts generally spread among all of the Employee group and are not isolated among a specific sector of Employees.

68.     The Debtor submits that payment of the outstanding Employee Obligations at this time is necessary and appropriate.

69.     In short, the Debtor seeks authorization, but not direction, to pay its Employees on account of the Employee Obligations accrued as of the Petition Date. The Debtor also requests that it be authorized to compensate in full those Employees owed amounts in excess of $10,950 on account of Employee Obligations accrued prior to the Petition Date for the reasons noted above. The Debtor requests such authorization in light of the devastating harm to employee morale that might develop if certain of the Debtor's Employees – many of whom have been employed by the Debtor for an extended period – were denied use of the same Employee Obligations that accrued as a direct result of their past loyalty and years of services to the Debtor. Furthermore, by this Motion, the Debtor requests authority to pay the Employee Obligations only in the ordinary course of its reorganization and ongoing business operations. The Debtor further reserves the right to limit the amount paid to Employees on account of the Employee Obligations. The Debtor also requests that, in the event an Employee uses, or is paid cash on account of Benefits representing pre-petition accruals from and after the Petition Date, such Benefits shall first be applied against benefits accruing post-petition and thereafter to benefits accruing pre-petition.

> **D.     Debtor's Motion To (I) Maintain Its Existing Bank Accounts And (II) Continue To Use Its Existing Cash Management System And Business Forms**

70.     As of the Petition Date, the Debtor maintains a total of 14 bank accounts with three different banking institutions for use in its operations.  Additionally, the Debtor currently utilizes a cash management system (the "Cash Management System") that is maintained, monitored and reviewed by, among others, the Debtor's bookkeeping staff and accountants.  The Debtor's cash management system consists of seven "hybrid" accounts used for both deposits and disbursements, five "zero balance" accounts used strictly for disbursements and two investment accounts (collectively, the "Bank Accounts").  The Debtor does not maintain a dedicated depository account.

71.     The Debtor is seeking a waiver of the requirement that a debtor close its existing bank accounts.  The Debtor requests that the Bank Accounts be deemed debtor in possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, style and document form (including checks) as during the pre-petition period, be authorized, subject only to (a) designation of such account in the books and records of the Debtor and by the affected financial institution as a debtor in possession account, and (b) a prohibition against honoring pre-petition checks without specific authorization from this Court.

72.     Requiring the Debtor to close the Bank Accounts and open new debtor in possession accounts would not be in the best interests of the estate.  The exercise would (1) be costly; (2) disrupt the Debtor's ability to satisfy post-petition payables in a timely manner; (3) interfere with the efficient management of the Debtor's cash resources; and (4) distract Debtor's managers at a time when the business requires their full attention.

73.     Additionally, in the ordinary course of its business, the Debtor uses a variety of checks and other business forms, including purchase orders, checks, packing slips, letterhead, and invoices (collectively, the "Business Forms").  The Debtor requests that this Court enter an

26

order permitting the Debtor to continue to use the Business Forms without alteration or change. Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtor's reorganization records.

74.    The Debtor also seeks a waiver of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code to permit the Debtor to maintain each of its deposit accounts that may, from time to time, exceed the amount insured by the Federal Deposit Insurance Corporation (the "FDIC").  The Debtor's account balances in excess of FDIC insurance limits are maintained with banks that are themselves financially stable.  Additionally, the Debtor seeks authorization to continue its investment practice of depositing excess cash in either its interest bearing, money market account or mutual fund investment account.  The Debtor submits that both investment accounts are safe, prudent and designed to yield the maximum reasonable net return on deposited funds.

75.    Requiring the Debtor to change its deposits and other procedures abruptly could result in harm to the Debtor, its estate and its creditors because it would disrupt its Cash Management System.  In addition, requiring the Debtor to open multiple accounts at different banks so that the deposits in each such account would be insured by the FDIC would be unnecessarily burdensome and would prevent the Debtor's financial staff from focusing their undivided attention on the Debtor's reorganization efforts.

### E.    Debtor's Motion To Deem Utilities Adequately Assured Of Future Performance Pursuant To Bankruptcy Code § 366

76.    The Debtor seeks entry of a Court order (a) prohibiting the Debtor's utility service providers from altering, refusing or discontinuing utility services on account of pre-petition invoices, including the making of demands for security deposits or accelerated payment terms

and (b) deeming the Debtor's utility service providers adequately assured of future performance by virtue of a dedicated cash deposit reserve fund (the "Utility Reserve") to be established by the Debtor.

77.     In connection with the operation of its business, the Debtor obtains electricity, water, telephone, and/or other similar services (collectively, the "Utility Services"), from approximately ten different utility companies (the "Utility Companies").

78.     The Debtor proposes to provide adequate assurance of payment to the Utility Companies for Utility Services provided to the Debtor following the Petition Date in the form of (i) payment as an administrative expense of their chapter 11 estates pursuant to sections 503(b) and 507(a)(l) of the Bankruptcy Code, and (ii) establishment of a dedicated cash deposit reserve fund in the amount of $121,805 within five (5) business days after entry of this order (the "Utility Reserve") for the sole benefit of Utility Services with respect to any unpaid post-petition utility charges.   The Utility Companies will have a first priority security interest in the cash deposit in the Utility Reserve.   The Debtor submits that the combination of the Utility Reserve and the granting of an administrative expense priority claim on account of post-petition services constitutes adequate assurance to the Utility Companies of payment for future services.

79.     If the Utility Companies are permitted to terminate Utility Services, there would be immediate severe and disastrous consequences caused by the resulting interruption in patient care.   Because uninterrupted utility service is vital to the Debtor's businesses, the health and safety of the Debtor's patients and necessary to the Debtor's reorganization efforts and, consequently, to the success of this chapter 11 case, the relief requested herein is necessary and in the best interests of the Debtor's estate and its creditors.

**F.**     **Debtor's Motion To Grant Administrative Expense Status To The Debtor's Undisputed Obligations Arising From The Post-petition Delivery Of Materials Ordered In The Pre-petition Period And To Pay Such Obligations In The Ordinary Course Of Business Pursuant To Sections 105(a), 363(c) And 503(b) Of The Bankruptcy Code**

80.     In the ordinary operation of the Debtor's business, numerous vendors and suppliers provide the Debtor with millions of dollars of materials necessary for the operation of its business, including over-the-counter and prescription medicines, medical supplies, equipment, and sanitary items.  As of the Petition Date, and in the ordinary course of business, the Debtor has numerous pre-petition purchase orders outstanding (the "Outstanding Orders") with various vendors and suppliers (the "Vendors") for such materials necessary for the operation of its businesses.  The Debtor estimates that its undisputed obligations to Vendors arising from the Outstanding Orders total approximately $1,225,000.

81.     As a consequence of the commencement of the Chapter 11 case, certain of the Vendors may have concerns that the post-petition shipment of materials under the Outstanding Orders will render the Vendors who make such shipments pre-petition general unsecured creditors of the Debtor's estate with respect to such shipments.  Accordingly, the Debtor seeks entry of an order granting administrative expense status to the Debtor's undisputed obligations arising from the Outstanding Orders and authorizing the Debtor to pay such obligations in the ordinary course of business.

82.     The relief requested herein will ensure a continuous supply of materials and medical supplies indispensable to the Debtor's ability to provide necessary medical care to its patients.

### G.    Debtor's Motion To Establish Procedures For Treatment Of Valid Reclamation Claims

83.    In the ordinary course of the Debtor's business, numerous vendors and suppliers provide the Debtor with millions of dollars of materials necessary for the operation of its business, including over-the-counter and prescription medicines, medical supplies, equipment, food and beverage supplies, and sanitary items (collectively, the "Goods") on credit.  As of the Petition Date, the Debtor may be in possession of certain Goods that were delivered to it, but for which it had not yet been invoiced by, or made payment to, the suppliers.  As a result of the commencement of this bankruptcy case, the Debtor expects to receive numerous written reclamation demands from various vendors or other parties (collectively, the "Sellers") with respect to the Goods.  The Debtor also anticipates that a number of Sellers, after becoming aware of the commencement of this Chapter 11 case, might attempt to interfere with the delivery of Goods to the Debtor, or to attempt forcibly to repossess delivered Goods from the Debtor.

84.    To avoid piecemeal litigation that would interfere with the Debtor's reorganization efforts, the Debtor seeks authority, pursuant to sections 105(a), 362 and 546(c) of the Bankruptcy Code, to establish exclusive procedures for the reconciliation and allowance of all asserted reclamation claims.

85.    If the Debtor is unable to establish and implement uniform procedures for addressing reclamation claims, the Debtor will face the prospect of simultaneously defending multiple reclamation proceedings or other enforcement efforts at a time when it needs to focus on critical aspects of the reorganization process.  The Debtor's business will be severely disrupted if the Sellers are allowed to exercise their reclamation rights without a uniform procedure that is fair to all parties.

**H.    Debtor's Application To Appoint Kurtzman Carson Consultants LLC As Claims, Noticing, Balloting And Disbursement Agent Of The Bankruptcy Court Pursuant To  28 U.S.C. § 156(c)**

86.    The Debtor seeks an order authorizing it to retain and employ Kurtzman Carson Consultants ("KCC") as claims, noticing and solicitation agent to, among other things:

(a)    serve as the Court's noticing agent to mail notices to certain of the estate's creditors and other parties-in-interest;

(b)    provide computerized claims, objection and balloting database services;

(c)    provide expertise, consultation and assistance in claim and ballot processing and with the dissemination of other administrative information related to the Debtors' Chapter 11 cases; and

(d)    provide plan voting and balloting services, and review and tabulate the cast of ballots to a plan.

87.    The Debtor has identified more than 1,500 creditors, potential creditors and other parties in interest to whom certain notices, including notice of the commencement of this chapter 11 case must be sent.  Given the number of parties involved in this case, it would be extremely burdensome for the Clerk of the Court for the United States Bankruptcy Court for the District of New Jersey, Newark Division (the "Clerk's Office") to efficiently and effectively docket and maintain the extremely large number of proofs of claim that likely will be filed with the Clerk's Office in this case.  The sheer magnitude of the Debtor's creditor body makes it impracticable for the Clerk's Office to undertake that task and send notices to the creditors and other parties in interest.

88.    The Debtor submits that the most effective and efficient way to process, docket, maintain, photocopy and transmit proofs of claim in this case is to engage an independent third

31

party to act as an agent of the Court.  The Debtor believes that KCC has the expertise and is well

qualified to provide such services, consultation and assistance.

> **I.     Debtor's Application To Retain, Employ And Compensate Cooley
> Godward Kronish LLP As Attorneys For The Debtor Nunc Pro Tunc
> To The Petition Date**

89.     Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Debtor, as

debtor in possession, respectfully requests that the Court approve the employment of Cooley

Godward Kronish LLP ("CGK"), under a general retainer, as its attorneys to perform the legal

services that will be necessary during this chapter 11 case.  The Debtor has selected CGK as its

attorneys because of the firm's extensive general experience and knowledge, and in particular, its

recognized experience in the field of debtors' and creditors' rights and business reorganizations

under chapter 11 of the Bankruptcy Code.  The Debtor believes that CGK is both well qualified

and uniquely able to represent it in this chapter 11 case in a most efficient and timely manner.

90.     The employment of CGK under a general retainer is necessary to enable the

Debtor to execute faithfully its duties as debtor in possession and to develop, propose, and

consummate a chapter 11 plan.  It is proposed that CGK will be employed to:

> (a)     Take all necessary action to preserve and protect the estate,
> including prosecute and defend litigation matters on the Debtor's
> behalf, negotiate disputes in which the Debtor is involved and
> prepare objections to claims filed against the Debtor's estate;
>
> (b)     Prepare on behalf of the Debtor, as debtor in possession, all
> necessary motions, applications, answers, orders, reports, and other
> papers in connection with the administration of the Debtor's estate;
>
> (c)     Provide assistance, advice and representation concerning the
> preparation and negotiation of a proposed plan or plans of
> reorganization and all related transactions and any revisions,
> amendments, etc. relating to same; and

32

> (d)    Perform such other legal services as may be necessary and appropriate for the efficient and economical administration of this chapter 11 case.

91.    The Debtor believes that CGK is qualified to represent its interests and the interests of its estate.  Were the Debtor unable to retain CGK in connection with the prosecution of this Chapter 11 case, the Debtor, its estate and all parties in interest would be unduly prejudiced by the time and expenses necessarily attendant to other counsel's need to familiarize itself with the intricacies of the Debtor's business, operations, capital structure and negotiated restructuring.

> **J.    Debtor's Application To Retain, Employ And Compensate Connell Foley LLP As Local Counsel For The Debtor Nunc Pro Tunc To The Petition Date**

92.    Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Debtor, as debtor in possession, respectfully requests that the Court approve the employment of Connell Foley LLP ("Connell Foley") as its local New Jersey bankruptcy attorneys to perform legal services that will be necessary during this Chapter 11 case, including, without limitation, in connection with filing pleadings on behalf of the Debtor and advising the Debtor with regard to local practices and procedures of this Court.

93.    The Debtor believes that Connell Foley is qualified to represent its interests and the interests of its estate and Connell Foley's retention will assist with CGK's representation of the Debtor and its estate in this case.

> **K.    Debtor's Application To Retain, Employ And Compensate Lindabury, McCormick, Estabrook & Cooper, P.C. As General Corporate Counsel For The Debtor Nunc Pro Tunc To The Petition Date**

33

94.     The Debtor seeks entry of an order authorizing the Debtor to employ Lindabury, McCormick, Estabrook & Cooper, P.C. ("LMEC") as general corporate counsel.  The Debtor seeks to retain LMEC because of the firm's highly regarded reputation and expertise in corporate transactional matters.  LMEC provides legal services in a wide array of practice areas, including labor and employment, banking and health care law.  Moreover, LMEC is well-familiar with the Debtor's operations because, prior to the Petition Date, LMEC performed legal services for the Debtor in connection with general corporate matters.

95.     The professional services that LMEC will render to the Debtor include, but shall not be limited to, health care, finance, labor and employment, tax, guardianships, real estate, and other corporate transactional matters.

**L.      Debtor's Motion To Mail Notices And To File A Consolidated List Of Creditors (Without Claim Amounts) In Lieu Of A Matrix**

96.     The Debtor requests the entry of an order authorizing the Debtor to mail initial notices and to file a consolidated list of creditors (without claim amounts) in lieu of a label matrix as required by Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1007-2 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").  Moreover, the Debtor requests authority to mail initial notices, such as notice of the commencement of the case and of the first meeting of creditors pursuant to section 341 of the Bankruptcy Code, which would otherwise be mailed by the Clerk of the Bankruptcy Court.

97.     The Debtor does not maintain a listing of the names, addresses and dollar amounts owed to each of its respective creditors in a format that is readily convertible to the required form of either a Creditor List or a Mailing Matrix.  Furthermore, the total number of parties-in-interest

in this chapter 11 case likely will include approximately 1,500 creditors and other parties-in-interest to whom notices in connection with this case must be given.  Accordingly, the Debtor respectfully requests entry of an order waiving the requirements of Bankruptcy Rule 1007 and Local Rule 1007-2.

98.    In light of the size and complexity of the Debtor's operations, the Debtor submits that it cannot easily comply with the mandates of Bankruptcy Rule 1007and Local Rule 1007-2, and that compiling the information contained in books, records and documents relating to numerous creditors and a multitude of transactions into the form of a Creditor List and Mailing Matrix would impose an enormous administrative and economic burden on the Debtor's estate. Additionally, the Debtor will furnish a consolidated list of creditors to KCC, its proposed Notice and Claims Agent, for the purpose of serving notice of commencement of the Debtor's chapter 11 case.

**M.    Debtor's Motion To Extend Time To File Schedules And Statement Of Financial Affairs As Required By Bankruptcy Rule 1007 And D.N.J. LBR 1007-1**

99.    The Debtor respectfully requests that the Court enter the order filed concurrently herewith extending the date for it to file its Schedules for approximately thirty (30) days (i.e., 45 days after the Petition Date) until May 31, 2007.  The Debtor further requests that, in the event a further extension becomes necessary, the Debtor has the option of automatically extending such period an additional thirty (30) days, subject to the consent of the United States Trustee, but without necessity of further order of the Court.

100.    During the initial phase of its Chapter 11 case, the Debtor will necessarily be preoccupied by other emergent matters relating to the commencement of its case and

35

stabilization of its business.  This is also a large and complex case which will require assembling

and organizing data from numerous sources within the Debtor and the Debtor's businesses.  As a

result, the Debtor will not be able to complete the Schedules within the current period of time

provided.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on this 16th day of April, 2007.

/s/ Daniel A. Kane_____
Daniel A. Kane
Acting President and Chief Executive Officer